UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DAVID A. CARLTON, SR. | * | CIVIL ACTION NO. 16-17599 |
| | * | |
| VERSUS | * | SECTION: "E"(1) |
| | * | |
| NANCY A. BERRYHILL, ACTING | * | JUDGE SUSIE MORGAN |
| COMMISSIONER OF THE SOCIAL | * | |
| SECURITY ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ********************************* | * | |

## REPORT AND RECOMMENDATION

The plaintiff, David A. Carlton, Sr., seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for supplemental security income under Title XVI of the Act, 42 U.S.C. § 1381. The matter has been fully briefed on cross-motions for summary judgment. [1] For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 10) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 12) be GRANTED.

## Procedural Background

Mr. Carlton applied for supplemental security income on December 29, 2014, asserting a disability onset date of December 29, 2014. He alleged the following illnesses, injuries, or conditions: back injury, leg, shoulder, and hip problems. On July 31, 2015, his claim was denied by the state agency. The Disability Determination Explanations concluded that although Mr. Carlton's condition "results in some limitations in [his] ability to perform work related activities .

---

[1] The Court has construed Mr. Carlton's brief in support of his claims as a Motion for Summary Judgment. (Rec. Doc. 11).

. . these limitations do not prevent [him] from performing work [he has] done in the past as [a security officer] . . . ."

Mr. Carlton obtained a non-attorney representative and requested a hearing before an Administrative Law Judge ("ALJ"), which was held on May 26, 2016. On August 25, 2016, the ALJ issued an adverse decision. The Appeals Council denied review on November 10, 2016.

On December 19, 2016, Mr. Carlton filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 8, 9). Mr. Carlton, now represented by counsel, filed a brief in support of his position, which this Court construes as a Motion for Summary Judgment. (Rec. Doc. 10). The Commissioner filed a Motion for Summary Judgment (Rec. Doc. 12).

## Evidence in the Record

### *Hearing Testimony*

At the hearing before the ALJ, Mr. Carlton was represented by Kiersten Pritchett, a non-attorney representative from the law office of James Connor. R. at 39. Ms. Pritchett stated that Mr. Connor was not alleging a listed impairment and agreed that the matter was "strictly Step 5." R. at 41. She argued that the combination of Mr. Carlton's impairments results in symptoms— including fatigue, numbness, tingling, dizziness, headaches, chronic pain, poor memory, and lack of concentration—that would interfere with his ability to work for two hour periods without interruption and would interfere with his ability to complete an eight-hour workday on a regular basis. R. at 42.

Mr. Carlton attended school through the eighth grade. R. at 44. He was 55 at the time of the hearing. R. at 64. He lives with his wife and twenty-nine year old daughter, both of whom

work. R. at 43-44. He noted that he applied for disability benefits in the 1990s, but said his claim had been denied because he had too many assets. R. at 45.

Mr. Carlton testified that he last worked in 2008 as a security guard at a casino. R. at 44-46. He was bonded and carried a gun. R. ta 47. He sat and watched over people or walked with the tellers and watched over them as they opened the machines. R. at 47. He testified that he worked in the position for less than a year. R. at 48. Before working as a security guard, Mr. Carlton was a door builder. R. at 48.

Mr. Carlton testified that he had not looked for work since his security guard job in 2008. R. at 51. The ALJ asked Mr. Carlton what was keeping him from working. R. at 51. Mr. Carlton testified that he was involved in a motor vehicle accident in 2014 and everything had gotten worse since then. R. at 51. He said he cannot walk, that his hips and lower back hurt, and that his shoulder and neck hurt on and off. R. at 51. He testified that the injections he had received earlier in the year had not helped at all. R. at 51. The ALJ pointed out that his medical records indicated that his pain levels were much better. R. at 52. Mr. Carlton testified that the hip injections had helped a little bit. R. at 52. His representative also asked him why he cannot perform a simple job. R. at 69. Mr. Carlton said the pain. R. at 69. He said that when he was 39, a doctor told him he had the body of a 52 year old. R. at 69.

Mr. Carlton confirmed that he smokes marijuana, sometimes daily. R. at 53. He said he does so for his nerves and muscle spasms, but he also testified that every doctor he has told about his marijuana use has advised him to quit. R. at 53-54. Mr. Carlton said he does not smoke regular cigarettes or drink alcohol. R. at 54.

Mr. Carlton testified that he could stand for 10 or 15 minutes. R. at 55. He can sit for about 30 minutes. R. at 55, 58. He said that he could walk less than a block. R. at 58. He testified that he experienced pain walking down the one flight of stairs in the parking lot before attending the hearing. R. at 55. Mr. Carlton was using a cane at the hearing and he testified that he was prescribed the cane by the consulting physician during his disability determination at the state level. R. at 56.

Mr. Carlton can drive, and he drove about an hour and 20 minutes to get to the hearing, stopping twice. R. at 58. He testified that he does not typically run errands other than driving his wife and son to work—about a 26 mile round trip. R. at 59. Mr. Carlton cuts the grass at home using a riding lawn mower. R at 59. Mr. Carlton described a typical day as getting up, taking his son to work, laying down or sitting at the computer, then taking his wife to work, then picking up his son and laying down or sitting at the computer, then going pick up his wife. R. at 61. On the computer he gets on Facebook or plays Fresh Deck Poker. R. at 62. He said the most physical thing he does is lay in a baby pool with his six-year old grandson. R. at 61. He said he goes out to his shed sometimes. R. at 63. He said he had changed the battery terminal on his truck the day before but said it would take him two hours to do a 10 minute job because he would stop and rest. R. at 63.

Mr. Carlton testified that he can prepare himself a sandwich. R. at 61-62. He said he can groom himself in the mornings, though bending down is a little difficult. R. at 62.

Ms. Pritchett asked Mr. Carlton about his diagnosis of amnesia and dementia. R. at 65. Mr. Carlton testified that this caused him to have trouble remembering things and that he had difficulty completing tasks because he would forget what he had started. R. at 65. He said he suffered from headaches a couple of times a week at a pain level of 8 on a scale of 1 to 10. R. at 66.

Mr. Carlton testified that his COPD makes it difficult for him to breathe in extreme heat. R. at 67. He testified that he takes medication for his diabetes. R. at 67. He denied suffering any side effects from his medication, but he noted that he has recently been suffering from vision problems and he thought this could be due to the medications he was taking. R. at 67-68.

Ms. Pritchett also asked Mr. Carlton about his neuropathy, and Mr. Carlton testified that he cannot feel the bottom of his feet and that he has constant numbness and tingling. R. at 68.

Mr. Carlton testified that he takes medication for pain but it does not relieve the pain completely. R. at 68.

*Vocational Expert*

Thomas Meunier testified as a vocational expert. R. at 70. He classified Mr. Carlton's former work as a door assembler, medium, semi-skilled, SVP 3; a security guard, light, semi-skilled, SVP 3; and a carpenter supervisor, light, skilled, SVP 7.

The ALJ posed the following hypothetical to Mr. Meunier: a person with Mr. Carlton's age, education, and vocational experience, who is limited to occasional stooping and crouching, but no exertional limitations. R. at 71. Mr. Meunier said these restrictions would not preclude Mr. Carlton's past relevant work. R. at 71.

The ALJ then added a medium exertional limitation along with only occasional climbing of ramps and stairs, with frequent crawling, kneeling, and balancing. R. at 71-72. Mr. Meunier testified that these additional restrictions would not preclude Mr. Carlton's past relevant work. R. at 72. The ALJ then added an additional limitation to simple, routine tasks and the requirement that complex instructions be written out to compensate for a memory or ability to understand limitation. R. at 72. Mr. Meunier said these mental restrictions would prevent work as a carpenter supervisor, but would not preclude door assembly or security guard work. R. at 72-73.

The ALJ then added a further limitation to light work. R. at 73. With this added restriction, Mr. Meunier testified that the security guard work would still be available. R. at 73.

The ALJ then added a further hypothetical restriction to walking or standing for no more than an hour at a time. R. at 73. Mr. Meunier said this would preclude all past work. R. at 73.

Finally the ALJ asked whether under any of the hypotheticals, a person who was off task for an hour more per day than the typical lunch and break schedule would be precluded from competitive work. R. at 74. Mr. Meunier said that this restriction would preclude competitive work. R. at 74.

Ms. Pritchett did not ask the vocational expert any questions.

*Medical Records*

Emergency room records indicate that Mr. Carlton was involved in a motor vehicle accident on January 6, 2014. R. at 240-41. At the time of admission, Mr. Carlton complained of right shoulder and neck pain and reported a history of chronic neck and shoulder problems. R. at 241. It was noted that he was not experiencing chest pain and was not short of breath. R. at 241. His breath sounds were normal. R. at 242. Mild reduction in range of motion in his right shoulder was noted, with normal range of motion in other extremities. R. at 242. A cervical spine and shoulder x-ray were performed and no fracture or dislocation were seen. R. at 242. The analysis of the cervical spine x-ray also noted no prevertebral soft tissue swelling and intervertebral disc spaces within normal limits. R. at 247. Mr. Carlton's weight was noted to be 320 pounds with a BMI of 47.26. R a. at 242. Mr. Carlton reported he was a current, daily smoker of one pack a day. R. at 242.

On January 9, 2014, Mr. Carlton treated with Gregory Bickham, a chiropractic doctor at the Healing Health Center ("HHC"). R. at 263. Mr. Carlton reported his cervical pain as 4 or 5 on

a scale of 1 to 10 before the motor vehicle accident and 8 since the accident. R. at 263. He described

his shoulder pain as 7 on a scale of 1 to 10. R. at 263. He also reported that he had no thoracic pain

before the accident but had been experiencing thoracic pain at level of 7 since the accident. R. at

263. He reported lumbar pain of 4 or 5 before the accident and 7 since the accident. R. at 263.

Despite the reports of past lumbar and cervical pain, the record of this visit also notes that Mr.

Carlton did not have any pain prior the motor vehicle accident. R. at 265.

With regards to past injuries, Mr. Carlton reported working on a house four years earlier

when a board fell on his head and right shoulder. R. at 264. Mr. Carlton reported he never smoked.

R. at 264. His weight was 320 pounds and his BMI was 47.3. R. at 264.

Dr. Bickham performed a physical examination and found tightness, tenderness to

palpation, and spasms of the cervical muscles. R. at 264. Mr. Carlton was found positive for all

cervical tests. R. at 264. There was decreased range of motion and pain in his right shoulder and

thoracic region. R. at 264-65. Dr. Bickham found that Mr. Carlton scored an 80 on the Oswestry

disability index, which indicated a very severe disability. R. at 265. A spinal function analysis was

performed (with activities like push/pull vacuum, wash dishes in sink, pour soup, carry 20lb

groceries, and dig with shovel). R. at 304. For each task, Mr. Carlton was scored on a scale of 1 to

5 with 1 being "able," 3 being "restricted," and 5 being "unable." R. at 304.  Mr. Carlton was not

able to do any of the 50 tasks without restriction. He could pour soup and pull a nail with restriction.

R. at 304. The remainder of tasks were scored at level 4 or 5. R. at 304. It appears the score

calculated was so low that Mr. Carlton would be unable to perform even sedentary work. R. at

304.

Mr. Carlton visited Dr. Bickham again on January 14, 2014. R. at 265. He reported pain

levels at the same level as during his earlier visit. R. at 265-66. Dr. Bickham performed a

computerized range of motion examination and found Mr. Carlton's impairment percentage to be 48%. R. at 266. Dr. Bickham noted that he found subluxation on assessment and adjusted C2, T4, L5, S1 right. R. at 266.

At his January 15, 2014, visit with Dr. Bickham, Mr. Carlton reported cervical and lumbar pain of 8 and thoracic pain at 7 on a 10-point scale. R. at 266. On January 16, 2014, Mr. Carlton reported improvements in pain with cervical pain at 6, thoracic pain at 3, and lumbar pain at 6. R. at 267. However, he still had decreased range of motion and pain in the cervical, thoracic and lumbar regions. R .at 267.

Throughout January and February 2014, Mr. Carlton continued to visit Dr. Bickham two or three times a week and reported pain levels in the cervical, thoracic, and lumbar regions that fluctuated between 5 and 7 (with one report of lumbar pain at level 10). R. at 268-79.

At his March 5, 2014, visit with Dr. Bickham, Mr. Carlton reported that he could walk to the mailbox and back without stopping, which he had not been able to do two weeks earlier. R. at 280. Mr. Carlton reported intermittent cervical pain at 6, constant thoracic pain at 5, and constant lumbar pain at 5. R. at 280. No decrease in motion was noted in any of the three regions, although some pain with movement was noted. R. at 280-81. Mr. Carlton scored a 46 on the neck disability index indicating a moderate disability and scored a 58 on the Oswestry disability index indicating a severe disability. R .at 281. His global range of motion impairment percentage had improved to 38%. R. at 281.

Mr. Carlton continued visiting Dr. Bickham throughout March 2014, reporting cervical, thoracic, and lumbar pain fluctuating between 4 and 6, with one report of cervical pain at 7 on a 10 point scale. R. at 281-85. On March 27, 2014, Mr. Carlton reported that if he is on his feet for 4 or 5 hours, his pain in his cervical and right upper trapezius increases. R. at 285. Mr. Carlton was

assessed with a score of 46 on the neck disability index indicating moderate disability and a score of 50 on the Oswestry index, indicating a severe disability. R. at 286. His global range of motion percentage had improved to 31%. R. at 286.

Between March 27, 2014, and April 28, 2014, Mr. Carlton reported to Dr. Bickham that his pain fluctuated between 4 and 6. R. at 286-90. On April 28, 2014, Mr. Carlton scored a 32 on the neck disability index, indicating moderate disability, and a 42 on the Oswestry disability index, indicating severe disability. R. at 280. His global range of motion impairment improved to 26%. R. at 290.

Mr. Carlton's visits to Dr. Bickham reduced over the next month, during which Mr. Carlton reported pain that fluctuated between 4 and 6, with one report of cervical pain at level 7. R. at 290-95. On June 5, 2017, he scored a 40 on the neck disability index, indicating a moderate disability, and scored 48 on the Oswestry disability index indicating a severe disability. R. at 295. His range of motion impairment percentage had improved to 21%. R. at 295.

Mr. Carlton continued to visit Dr. Bickham about twice a month through June, July, and August 2014. R. at 296-301. He reported pain that fluctuated from 3 to 6, with one report of cervical pain at 7 and two reports of intermittent lumbar pain fluctuating between 3 and 8. R. at 296-301. On September 3, 2014, Mr. Carlton scored a 38 on the neck disability index, indicating a moderate disability, and scored 28 on the Oswestry disability index, indicating a moderate disability. R. at 300-01. His range of motion impairment percentage measured at 34%. R. at 301.

On July 31, 2014, Dr. Bickham referred Mr. Carlton for a weight-bearing MR examination of the lumbar spine. R. at 344. However, Mr. Carlton "was unable to tolerate the examination. Only sagittal T2 weighted images in the erect weight-bearing neutral posture were able to be attained." R. at 344. The radiographic summary noted internal derangement, internal disruption,

and protrusion versus artifact of the L4-L5 intervertebral disc; protrusion at T10-11; internal derangement and prominent bulging at L5-S1; bulging of L1-L2, L2-L3, and L3-L4, and T11-T12; lumbar facet arthrosis; straightening of the lumbar lordosis with the patient in the erect weight-bearing passive neutral posture indicating a pattern of muscle spasm. R .at 346.

On February 6, 2015, Mr. Carlton visited Total Family Medical to establish a primary care physician. R. at 381. He was seen by Cassie Guste, a family nurse practitioner. R. at 381. Mr. Carlton complained of hypertension, diabetes, and chronic pain. R. at 381. He reported intermittent pain, rating his back pain and neck pain at 4 on a 10 point scale. R. at 381. He reported hip pain with walking at 8 or 9. R. at 381. He reported he could barely walk 200 feet. R. at 381. He reported numbness and tingling with neuropathy in bilateral extremities and complained of muscle spasms in the upper and lower back. R. at 381. He was found to have full range of motion in his extremities, he was alert and oriented, had appropriate affect and demeanor, and had normal thought and perception. R. at 382. His insulin and blood pressure medications were refilled, he was advised to continue daily foot exams, and he was advised to see pain management for chronic pain. R. at 383.

Mr. Carlton returned to Total Family Medical on February 27, 2015, and was seen by Brooke James, a family nurse practitioner. R. at 384. Mr. Carlton requested a referral to Dr. Troy Beaucoudray for pain management. R. at 384. A review of systems was performed and James concluded that Mr. Carlton was generally healthy, well developed, well nourished and in no acute distress. R. at 385. He was noted to be "morbidly obese." R. at 385. James discussed a diabetic diet with Mr. Carlton "at length" for over thirty minutes, providing education regarding adverse effects of unmanaged diabetes, including kidney failure, neuropathy, possible loss of extremities and blindness. R. at 385. James reported that Mr. Carlton was "not interested in mak[ing] any dietary changes besides substituting diet coke for regular coke." R. at 385.

Mr. Carlton followed up at Total Family Medical on June 12, 2015, and was seen by Nurse James. R. at 386. James' notes primarily concern a discussion regarding Mr. Carlton's diabetes treatment. R. at 387. Mr. Carlton reported his lowest blood sugar had been 68 and his average fasting blood sugar was 130-200. R. at 387. Mr. Carlton was due for blood work but refused to proceed until a billing issue had been resolved. R. at 386-87. Mr. Carlton's blood pressure was elevated to 159/94. R. at 387. He explained that he had not taken his Lisinopril and amlodipine because he was in a hurry. R. at 387.

Dr. Ryan Richard performed a consultative examination of Mr. Carlton on July 11, 2015. R. at 356. Mr. Carlton reported that he was a smoker that had been smoking half-a-pack of cigarettes a day for 13 years. R. at 356. He also reported using marijuana. R. at 356. Mr. Carlton reported that he did not use an ambulatory device to get around. R. at 357. Dr. Richard noted that Mr. Carlton was able to get up and out of a chair and on and off of the examination table without difficulty. R. at 358. His gait was noted to be normal. R. at 358. There was no evidence of scoliosis, no spasm of the paraspinous muscles, and no evidence of kyphosis. R. at 359. Mr. Carlton was able to walk on his toes and was able to walk on his heels. R. at 359. He could squat to the ground and recover and he could bend over and touch his toes. R. at 359. Sitting straight leg test was 80 degrees for both right and left leg, and was positive for pain. R. at 359. The supine straight leg raise test was 70 degrees for both right and left legs and was positive for pain. R. at 359. Mr. Carlton had normal grip strength in both hands. R. at 360. His fine and gross manipulative skills were normal in both hands. R. at 360. His motor strength was 5/5 in all extremities. R. at 360. His range of motion was normal. R. at 360. Dr. Richard found the only limitations on Mr. Carlton's functioning were that he has a limited ability to bend or stoop. R. at 360.

Mr. Carlton returned to Total Family Medical for medication refills and lab work on September 12, 2015. R. at 388. He was seen by Nurse James. R. at 388. Mr. Carlton reported that he had not been taking Lantus regularly and did not get Farxiga due to cost. R. at 388. He reported increasing fatigue and shortness of breath with exertion. R. at 388. He also complained about chronic back pain and reported that he felt like his memory was failing. R. at 388. He reported that since January, he could not remember things and even had trouble keeping track of where his grandchild is at times. R. at 388-899. He reported that he had stopped eating sugary foods and had been watching his salt intake. R. at 389. He requested a referral to a neurologist for memory loss. R. at 389. Upon examination, he was described as "hypertensive, obese, appropriately groomed, in no apparent distress." R. at 389. He had full range of motion. R. at 389. It was noted that his insight and judgment were impaired. R. at 389. A mini mental state examination was performed and he scored 26 out of 30, which was noted to be normal. R. at 389. He was referred for a pulmonary function test for his complaint of dyspnea with exertion. R. at 389.

On October 19, 2015, Mr. Carlton presented to neurologist Dr. Pervez Mussarat complaining of memory loss. R. at 373. Mr. Carlton reported "a two-day forgetfulness easily [sic] which is progressively getting worse." R. at 374. He was diagnosed with "Other amnesia," "Dementia in other diseases classified elsewhere without behavioral disturbance," "Essential (primary) hypertension," and "Type 2 diabetes mellitus with hyperglycemia." R. at 374. It was noted that an MRI of the brain and blood tests would be obtained. R. at 375.

On November 3, 2015, Mr. Carlton visited Dr. Todd Aust at the Neuroscience & Pain Institute complaining "I just hurt all over." R. at 501. Mr. Carlton reported being a "non-smoker." R. at 502. He complained of headaches, anxiety, depression, and stress. R. at 502. He reported over 10 years of neck and back pain and said that medication had begun to be less helpful over

time. R. at 504. In conducting a review of systems, Dr. Aust noted "memory loss "and "complains of headaches" under neurological. R. at 502. Upon examination, "acute distress; obese" was noted. R. at 503. Dr. Aust found decreased range of motion and increased pain in the thoracic and lumbar spine. R. at 503. Increased pain with range of motion of the cervical spine was noted. R. at 503. Mr. Carlton had normal strength in upper and lower extremities. R. at 503. Mr. Carlton was able to walk forward, but could not bend forward and touch his toes, tip toe, or walk backward on his heels. R. at 503. Problems were noted as spondylosis without myelopathy or radiculopathy in the cervical and lumbar regions. R. at 503-04. Trochanteric bursitis (unspecified hip) was also noted. R. at 504. Dr. Aust prescribed new medication and scheduled medial branch blocks. R. at 504.

Mr. Carlton returned to Dr. Aust on January 11, 2016 for a follow up visit and reported "I'm doing great." R. at 506. He reported he was doing much better with medication but was still experiencing severe pain in the bilateral trochanteric bursa and would like an injection for that. R. at 509. Dr. Aust decided to hold off on Mr. Carlton's lumber medial branch block. R. at 509. Physical examination was the same as in November 2015. R. at 508. In the review of systems, Dr. Aust again noted "memory loss" and "complains of headaches" under neurological. R. at 507.

Mr. Carlton returned to Dr. Mussarat on February 10, 2016, to follow up for decreased memory and hypertension. R. at 394 It was noted that Mr. Carlton "could not do MRI" and that the "CT scan of the brain showed fairly significant small vessel disease." R. at 394. The CT scan was performed on February 3, 2016. R. at 404. The radiologist, Dr. Curtis Partington, concluded that "there is diffuse patching white matter disease. It would probably be worth doing an MRI of the brain to further evaluate this." R. at 404. Dr. Mussarat conducted a review of systems. R. at 395. Mr. Carlton complained of hypertension but denied chest pain or pressure. R. at 395. He also denied dyspnea. R. at 395. He complained of numbness, tingling, stiffness, and muscle weakness,

as well as dizziness, headache, and neck pain. R. at 395. Dr. Mussarat increased Mr. Carlton's Lisinopril dosage and ordered that he continue on amlodipine and start on 325mg of aspirin. R. at 396.

On February 15, 2016, Mr. Carlton visited Dr. Aust for a trochanteric bursa injection. R. at 510. He tolerated the procedure well. R. at 510.

Mr. Carlton followed up again with Dr. Mussarat on February 17, 2016, for decreased memory, small vessel disease of the brain, and hypertension. R. at 467. Mr. Carlton reported fatigue, dizziness, headache, neck pain, and numbness and tingling. R. at 468. He denied muscle weakness. R. at 468. Upon physical examination, no change in weakness was noted. R. at 468. It was noted Mr. Carlton was sitting quietly with no discomfort. R. at 468. Dr. Mussarat referred Mr. Carlton to nephrology "for management of extreme high-pressure which may be causing the small vessel disease of the brain." R. at 469.

Mr. Carlton visited the emergency room at North Oaks Medical Center on February 17, 2016. R. at 476. He reported that he had been seen by Dr. Mussarat and sent to Dr. Rab because of high blood pressure. R. at 479. He reported that he felt fine. R. at 479. He denied headache, chest pain, and shortness of breath. R. at 479. He was ordered to discontinue Lisinopril and start Zestoretic. R. at 490. He was ordered to continue amlodipine. R. at 490. Mr. Carlton was discharged in stable condition. R. at 477.

Mr. Carlton visited Family Healthcare of Loranger, Inc., on February 18, 2016, and was seen by nurse practitioner Kimberly Manina. R. at 431. Mr. Carlton reported that he had been referred to nephrology, who sent him to the emergency room. R. at 432. He reported shortness of breath and shortness of breath with excessive walking. R. at 432. He reported swelling in his extremities but no muscle weakness. R. at 432. He reported fatigue and fatigue when walking long

distances. R. at 432. Upon physical examination, Mr. Carlton was found to be ambulating normally with normal gait and station, normal strength, normal tone and normal movement of all extremities. R. at 433. Nurse Manina noted "poor insight, [patient] did not get [prescription] for [blood pressure] filled yesterday." R. at 433. She noted "recent memory normal." R. at 433. Mr. Carlton was referred to Dr. Treanor for treatment of diabetes and hypertension and referred to cardiologist Dr. Mikdadi for evaluation. R. at 433. Mr. Carlton's scheduled pulmonology appointment was mentioned. R. at 433.

Mr. Carlton visited the Internal Medicine Clinic of Tangipahoa on February 18, 2016, for pulmonary function testing. R. at 423. The technician reported that Mr. Carlton was cooperative "but all maneuvers appeared to be [suboptimal]." R. at 426. Dr. Janine Parker reported that spirometry revealed mild obstructive lung disease, lung volume indicated air trapping was present, and that diffusion capacity was normal. R. at 427.

Mr. Carlton visited Dr. Leonard C. Treanor at the Internal Medicine Clinic on February 18, 2016. R. at 412. Mr. Carlton denied shortness of breath with exertion, he denied painful joints and denied weakness. R. at 413. Upon examination, Mr. Carlton had full range of motion and normal motor strength in the upper and lower extremities. R. at 412. He was assessed with diabetes mellitus type 2, hypertension, neuropathic pain, and shortness of breath. R. at 413. Dr. Treanor noted that Mr. Carlton's diabetes was poorly controlled. R. at 413. He was referred to diabetic education for iPro glucose monitoring. R. at 413. Pulmonary function tests were ordered. R. at 413.

Mr. Carlton visited Dr. Treanor on March 3, 2016 for glucose monitoring. R. at 411. Mr. Carlton followed up with Dr. Treanor on March 7, 2016. R. at 409. His weight was 312 pounds and his BMI was recorded as 46.07. R. at 409. He again denied shortness of breath, joint pain, and

weakness. R. at 410. Mr. Carlton was noted to have full range of motion and normal motor strength in upper and lower extremities. R. at 409. He was assessed with diabetes mellitus type 2, hypertension, neuropathic pain, and COPD. R. at 409. Mr. Carlton was ordered to start baclofen, to stop Lisinopril 20mg and to start cyanocobalamin solution injections once a month. R. at 410. Lisinopril was increased to 40/25. R. at 410. A vitamin B12 injection was administered. R. at 410.

A medical source statement appears in Mr. Carlton's medical records. It is difficult to decipher the signature, but the statement was submitted by Mr. Carlton's representative as being from Dr. Leonard Treanor. The statement is a form that Dr. Treanor partially filled out. Dr. Treanor reports Mr. Carlton was diagnosed with back pain, with "range of motion" as the only listed objective sign. R. at 519. No abnormal gait, muscle weakness or spasm, or abnormal posture was noted. R. at 519. Dr. Treanor reported that Mr. Carlton frequently experiences pain of sufficient severity to interfere with attention and concentration and that his impairments are expected to last at least 12 months. R. at 520. Dr. Treanor did not fill out the section of the form regarding functional abilities and limitations, noting merely that Mr. Carlton could never twist, stoop, crouch/squat, climb ladders, or climb stairs. R. at 522.

On March 7, 2016, Mr. Carlton returned to Dr. Aust and reported that his lower back and hips hurt. R. at 514. Mr. Carlton reported that pain improved with rest and medication and that pain was made worse with bending, lifting, walking, or sitting for extended periods of time. R. at 514. He also reported decreased range of motion and activity. R. at 514. Dr. Aust also noted that Mr. Carlton reported improvement in his localized lateral hip pain and improvement in the distance he could walk since his injections. R. at 517. Mr. Carlton reported that he was having increased pain in his right lumbar facets since he started walking more and also complained of pain in his right knee. R. at 517. Mr. Carlton reported that his hammer hangs on his tool belt and frequently

hits him in this location. R. at 517. Again the review of neurological symptoms noted "memory loss" and "complains of headaches." R. at 515. Mr. Carlton also complained of anxiety, depression, and stress. R. at 515.

Mr. Carlton was seen by Dr. Ghiath Mikdadi on March 21, 2016. R. at 440. Mr. Carlton reported moderate dyspnea with activity with associated chest pain and discomfort. R. at 441. Mr. Carlton reported he was a former smoker. R. at 442. Upon physical examination Mr. Carlton had normal gait, normal motor strength and tone, no joint tenderness or swelling. R. at 443. An echocardiogram was ordered. R. at 443.

The echocardiogram and stress test were performed on March 23, 2016. R. at 446. Ejection fraction was 57%. R. at 446. Conclusions were 1) negative cardiolitic stress test for ischemia and 2) normal left ventricular function. R. at 443.

Mr. Carlton returned to Dr. Mikdadi on April 5, 2016. R. at 438. It was noted that Mr. Carlton's echocardiogram showed normal ejection fraction, his stress test was negative, and he was awaiting results of a sleep study. R. at 438. He reported dyspnea on exertion and shortness of breath, but no chest pressure or pain, no fatigue, and no light-headedness. R. at 440.

A sleep study was performed on April 28, 2016, by Dr. Mark Knower at the Southern Sleep Institute, LLC. R. at 525. Dr .Knower concluded Mr. Carlton had severe obstructive sleep apnea— worse in REM sleep, severe obesity, significantly reduced sleep efficiency, abnormal sleep architecture, and no periodic limb movement. R. at 525.

On June 27 2016, Mr. Carlton began physical therapy. R. at 552. He reported constant pain at 7-10 on a 10 point scale. R. at 552. He scored 83% disability score on shoulder pain and disability index. R. at 552. His trunk flexion was limited to 60/80 degrees and balance on right foot was limited to 5 or 10 seconds with eyes open. R. at 552. He continued physical therapy for

approximately twice per week for 22 visits, starting with aquatic therapy. On June 30, 2016, it was noted that pain was less after treatment. R. at 607. On July 12, 2016, it was noted that Mr. Carlton had improved tolerance to exercises and speed with improved postural awareness. R. at 601. On July 14, 2016, Mr. Carlton noted less muscle pain. R. at 599. Improved tolerance with less pain in the aquatic setting was noted on July 19, 2016. R. at 597. On July 28, 2016, improvement in ability to perform functional activities at home was noted, but Mr. Carlton still experienced pain. R. at 591. On August 8, 2016, Mr. Carlton reported that the rhizotomy helped a lot. R. at 587. On August 11, 2016, a COPD flare up was noted. R. at 585. On August 23, 2016, it was noted that Mr. Carlton had difficulty due to cramping. R. at 581. On September 1, 2016, Mr. Carlton reported he was ready to try land based exercises. R. at 575. On September 7, 2016, it was noted Mr. Carlton had increased pain with land based exercises. R. at 573. Mr. Carlton felt ill on September 14, 2016, reporting that he had been hurting for a week and that he felt disoriented and had low blood sugar. R. at 571. On September 15, 2016, it was noted that Mr. Carlton had progressed well with aquatic exercises but that he had limited tolerance for the land based exercises. R. at 569. A patient outcome questionnaire was performed with Mr. Carlton on September 15, 2016. R. at 567. Mr. Carlton reported that pain prevents him from walking more than a half mile, sitting for more than 1 hour, standing for more than 10 minutes. R. at 567. He also reported that pain medication provides him with complete relief from pain. R. at 567. Functional improvement was reported to be good. R. at 567. He reported pain at level 7 on a 10 point scale. R. at 567. Objective tests scored Mr. Carlton 48% disability on the modified Oswestry low back pain index and 58% on the shoulder pain and disability index. R. at 564. Core strength was noted as 3 of 5. R. at 565. He failed the single leg bridge test. R. at 565. All range of motion examinations were within functional limits. R. at 564-65.

On September 15, 2016, Mr. Carlton visited Dr. Robert McAfee, complaining of right ankle pain. R. at 529-30. He was diagnosed with arthritis of the ankle. R. at 538. Options for treatment were discussed and Mr. Carlton elected to go with injection and asked for a referral to a foot and ankle specialist for possible surgery. R. at 541. He was provided an injection of Marcaine and depo-medrol. R .at 541.

## Decision of the Administrative Law Judge

The ALJ found that Mr. Carlton has not engaged in substantial gainful activity since December 29, 2014, the application date. R. at 13. The ALJ found that Mr. Carlton has the following severe impairments; disorders of the back/spine, morbid obesity, and diabetes. R. at 13. In making this decision, the ALJ determined that Mr. Carlton's impairments of high blood pressure, arthritis, neuropathy of the feet, chronic obstructive pulmonary disease ("COPD"), sleep apnea/sleep efficiency, and memory issues, were not severe. R. at 13-15. The ALJ found that Mr. Carlton does not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 15. In making this determination, the ALJ considered listing 1.02 (major dysfunction of a joint) and listing 1.04 (back impairment). R. at 15. Noting that diabetes mellitus is no longer a listed impairment, the ALJ also determined that there was no evidence of complications of diabetes as described in Section 9.00B.5. R. at 15. The ALJ recognized that Mr. Carlton was at level III obesity and considered the combined effects of obesity and other impairments. R. at 15-16. However, the ALJ found that the record did not establish that his obesity combined with other impairments met the requirements of a listed impairment. R. at 16. The ALJ noted that Mr. Carlton's obesity is not at a level that it results in an inability to ambulate, his gait is normal, and he does not require use of a cane. R. at 16.

The ALJ then proceeded to Step 4 and determined Mr. Carlton's residual functional capacity, finding that Mr. Carlton can perform light work, except that he can lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently; he can stand or walk for six hours in an eight hour work day and can sit for six hours in an eight hour work day; he can occasionally climb ramps and stairs; he can never climb ladders, ropes, or scaffolds; he can occasionally stoop and kneel; and he can frequently crawl and balance. R. at 16. Of note to the present appeal, in making this finding, the ALJ gave little weight to the residual functional capacity assessment form filled out by Dr. Treanor. In so doing, the ALJ explained that Dr. Treanor had listed back pain as a diagnosis, rather than a symptom and that Dr. Treanor had failed to assess how the back pain affects Mr. Carlton's ability to work. R. at 19. Considering the testimony of the vocational expert, the ALJ next concluded that Mr. Carlton is able to perform his past work as a security guard because that work does not require performance of work-related activities precluded by Mr. Carlton's residual functional capacity as determined by the ALJ. R. at 20. Thus, the ALJ concluded that Mr. Carlton has not been under a disability as defined by the Act, since December 29, 2014, the date the application was filed. R. at 20.

### Statement of Issues on Appeal

Issue No. 1.  Whether the ALJ's determination that Mr. Carlton's dementia was asymptomatic, and therefore, non-severe, is supported by substantial evidence?

Issue No. 2.  Whether the ALJ's treatment of the issue of Mr. Carlton's obesity complies with the appropriate legal standard?

Issue No. 3  Whether the ALJ's decision to give little weight to the opinions of Mr. Carlton's treating physician comports with the appropriate legal standard and is supported by substantial evidence?

**<u>Analysis</u>**

I. **<u>Standard of Review.</u>**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. <u>Perez v. Barnhart</u>, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is more than "a mere scintilla," but less than a preponderance. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Hames v. Heckler</u>, 707 F.2d 162, 164 (5th Cir. 1983). Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. <u>Carey v. Apfel</u>, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's. <u>Perez</u>, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. <u>See</u> <u>Arkansas v. Oklahoma</u>, 503 U.S. 91, 113 (1992). Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. <u>Ripley v. Chater</u>, 67 F.3d 552, 555 (5th Cir. 1995).

II. **<u>Entitlement to Benefits under the Act.</u>**

To be considered disabled under the Act, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. <u>See</u> 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. <u>Id.</u> Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

<u>Perez</u>, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." <u>Id.</u> Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. <u>Id.</u> An assessment of the claimant's residual functional capacity is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. <u>Id.</u>

## I.     **Plaintiff's Appeal**.

*Issue No. 1.      Whether the ALJ's determination that Mr. Carlton's dementia was asymptomatic, and therefore, non-severe, is supported by substantial evidence?*

Mr. Carlton argues that the ALJ erred in determining that Mr. Carlton's dementia is "non-severe because it remains asymptomatic." He says that the ALJ incorrectly interpreted the diagnosis of "dementia without behavioral disturbance" to mean that his dementia is asymptomatic. Mr. Carlton says that the billing code of dementia without behavioral disturbance describes the diagnosis as "[a]n acquired mental disorder with loss of intellectual abilities of

sufficient severity to interfere with social or occupational functioning . . . involve[ing] memory, behavior, personality, judgment, attention, spatial relations, language, abstract thought, and other executive functions." Mr. Carlton also argues that the record conflicts with the ALJ's determination because Mr. Carlton reported his memory was "failing" to nurse James at Total Family Medical and James noted Mr. Carlton's insight and judgment were impaired. Mr. Carlton also points out that on February 3, 2016, he underwent a CT of the brain, which noted diffuse patchy white matter disease. At another appointment in February he complained of decreased memory and later in February, Mr. Carlton was referred to nephrology because Dr. Mussarat believed high blood pressure might be causing the small disease of his brain. Mr. Carlton notes that he complained of memory loss at his pain management appointments in November 2015, January 2016, February 2016, and March 2016. Mr. Carlton acknowledges that the record does not mention disorientation, weakness, or confusion, but insists that the record references to "memory loss" are sufficient to establish a symptom of dementia that should have led the ALJ to conclude that Mr. Carlton's dementia is severe.

The Commissioner responds that the ALJ's finding that Mr. Carlton's dementia is non-severe is supported by substantial evidence. The Commissioner argues that "memory loss" does not establish a severe impairment, noting that although Mr. Carlton testified that he has trouble remembering and completing tasks, he also testified that he does mechanical and body work in his shed, he leaves home multiple times a day to take and pick up his son and wife from work—a 13 mile drive each way, he attends doctor's appointments, and he plays poker on the computer during the day. The Commissioner points out, as the ALJ did and as Mr. Carlton acknowledges, that the record contains no complaints of disorientation or confusion. Noting that examples of basic mental work activities include using judgment; understanding, carrying out, and remembering simple

instructions; and responding appropriately to supervision, co-workers, and usual work situations, see 20 C.F.R. § 416.922, the Commissioner argues that substantial evidence supports the ALJ's finding that Mr. Carlton does not have an impairment or combination of impairments that affect his ability to perform basic mental work activities.

The parties do not dispute that the appropriate standard for determining whether an impairment is severe is to use the standard announced in Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985). Thus, "[a]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985) (quoting Estran v. Heckler, 745 F.2d 340, 341 (5th Cir. 1984)) (second alteration in original). The Court notes that where the ALJ's analysis proceeds beyond Step 2, an error in failing to find an impairment severe does not require reversal. Compare Jones v. Bowen, 829 F.2d 524, 527 n. 1 (5th Cir. 1987) (rejecting the claimant's challenge to the ALJ's severity finding at Step 2 because the ALJ had proceeded through the full sequential evaluation process) and Chaparro v. Bowen, 815 F.2d 1008, 1011 (5th Cir. 1987) (rejecting the claimant's argument that the ALJ had employed the wrong standard to assess whether his impairment was severe because the ALJ proceeded through the full analysis and ultimately determined that the claimant could return to his past relevant work) with Stone v. Heckler, 752 F.2d 1099, 1106 (5th Cir. 1985) (reversing the ALJ's decision where the incorrect "severity" standard was applied at Step 2 and the ALJ denied the claim on the basis that the claimant had no severe impairment).

Here, the only symptom of dementia that Mr. Carlton points to is his complaint of "memory loss." There is little evidence of what effect this complaint has on his ability to function or perform

work related tasks besides his testimony that he had trouble remembering things and that he had difficulty completing tasks because he would forget what he had started. R. at 65. As the Commissioner points out, Mr. Carlton testified that he could perform activities like taking his wife and son to and from work and playing poker or looking at Facebook on the computer. R. at 59-62. The ALJ was swayed by the lack of complaints of disorientation or confusion in concluding that Mr. Carlton's dementia was not severe. Contrary to Mr. Carlton's suggestion, the ALJ did not rely on the diagnosis code dementia "without behavioral disturbance" in determining that Mr. Carlton's dementia is not severe under the Act. The lack of behavioral disturbance is certainly consistent with a finding that Mr. Carlton's dementia is not severe, even though a person might receive this diagnosis and have severe dementia if there was evidence that the person's ability to work was impaired. There is substantial evidence to support the ALJ's finding that Mr. Carlton's dementia is not severe.

Moreover, even if there was not substantial evidence to support the ALJ's finding that Mr. Carlton's dementia is not severe, the ALJ did not find Mr. Carlton not disabled on this basis. Instead, the ALJ proceeded beyond Step 2 and considered all of Mr. Carlton's impairments in assessing his residual functional capacity. Accordingly, the ALJ's decision should not be reversed or remanded for his failure to find Mr. Carlton's dementia to be severe.

*Issue No. 2.        Whether the ALJ's treatment of the issue of Mr. Carlton's obesity complies with the appropriate legal standard?*

Mr. Carlton next argues that the ALJ applied the incorrect legal standard in evaluating Mr. Carlton's obesity.[2] He points out that Social Security Ruling 02-1P instructs that "[t]he combined effects of obesity with other impairments may be greater than might be expected without obesity.

---

[2] The Court notes that in the pre-hearing memorandum submitted on Mr. Carlton's behalf, Mr. Carlton's representative made no reference to obesity or Mr. Carlton's weight and its effect on his other conditions. R. at 217.

For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone." Titles II & XVI: Evaluation of Obesity, SSR 02-1P (S.S.A. Sept. 12, 2002). Mr. Carlton acknowledges that the ALJ referenced SSR 02-1p and agrees with the ALJ's determination that Mr. Carlton's obesity does not rise to the level of meeting or equaling a listed impairment. Instead, Mr. Carlton argues that the ALJ erred by failing to explain how and why he considered the effects of Mr. Carlton's obesity. Mr. Carlton points that the ALJ noted "the claimant's weight likely affects his back and the fluctuation of his blood sugars as his body mass index remains above 45" in a paragraph where the ALJ discusses his finding that Mr. Carlton's symptoms are less than alleged. Mr. Carlton argues that in so doing, the ALJ improperly discounted Mr. Carlton's symptoms as being a result of his obesity, rather than considering the effect of obesity on his symptoms.

The Commissioner counters that the ALJ considered all of Mr. Carlton's symptoms, the objective evidence, and opinion evidence in determining Mr. Carlton's residual functional capacity. The Commissioner points out that the ALJ referenced Mr. Carlton's obesity and BMI and stated that he considered the effect of Mr. Carlton's obesity. The Commissioner rightly notes that Mr. Carlton has failed to point out any evidence that his obesity caused additional impairments or limitations beyond those found by the ALJ. The Commissioner adds that the ALJ considered Mr. Carlton's activities of daily living like his ability to work in his shed with a tool belt on and driving numerous times during the day.

The Court finds that the ALJ did not err in his assessment of Mr. Carlton's obesity. The ALJ considered Mr. Carlton's allegations of neck, back, and hip pain by assessing his MRI results, Dr. Aust's findings (including Mr. Carlton's reports to Dr. Aust in January and March 2016 that he was experiencing improvement with pain), Dr. Richard's findings in his consultative

examination, and Mr. Carlton's testimony. The ALJ noted that while medical records show some decreased range of motion, he noted that other examinations showed no joint tenderness. The ALJ considered Mr. Carlton's report of improvement with pain medication and Mr. Carlton's testimony regarding his daily activities. In considering all of this evidence, the ALJ necessarily considered the combination of obesity and back/neck/hip pain. In other words, to the extent obesity affected his hip pain, this is reflected in Mr. Carlton's actual reports of hip pain.

The ALJ's statement that Mr. Carlton's weight might affect his back and blood sugar in a paragraph explaining why Mr. Carlton's complaints are less severe than alleged might seem to suggest that the ALJ discounted Mr. Carlton's allegations of back pain and diabetes. However, the rest of the ALJ's opinion does not support the conclusion that the ALJ failed to consider the effect that obesity had in exacerbating Mr. Carlton's impairments. Importantly, the ALJ considered all of the evidence in assessing Mr. Carlton's residual functional capacity. For example, after examination, Dr. Richard concluded that the only limitations to Mr. Carlton's functioning were to his ability to bend and stoop. The state agency physician concluded that Mr. Carlton had the residual functional capacity to lift 50 pounds occasionally and 25 pounds frequently. The ALJ only gave the state agency physician's opinion partial weight, finding that Mr. Carlton's "impairments of morbid obesity dictates further reducing the claimant's residual functional capacity to less than the full range of light." Thus the ALJ clearly considered the effect of obesity in imposing higher limitations than the state agency physician (that is, limiting Mr. Carlton to lifting ten pounds frequently and 20 pounds occasionally, with only occasional climbing of ramps and stairs, occasional stooping and kneeling, and never climbing ladders, ropes and scaffolds).

The Court finds that the ALJ's determination of Mr. Carlton's residual functional capacity is supported by substantial evidence and that the ALJ's consideration of the effect of Mr. Carlton's obesity on his symptoms was not in error.

*Issue No. 3*      *Whether the ALJ's decision to give little weight to the opinions of Mr. Carlton's treating physician comports with the appropriate legal standard and is supported by substantial evidence?*

Mr. Carlton argues that the ALJ's decision to give little weight to Mr. Carlton's treating physician, Dr. Treanor, is contrary to law and is not supported by substantial evidence. He notes that a treating physician's opinion should be given greater weight than the opinion of a non-treating physician because treating physicians are more likely to be the medical professionals most able to provide a detailed, longitudinal picture of a claimant's medical impairments.[3] However, the opinion of Dr. Treanor hardly fits this description. The Medical Source Statement is a form with 16 sections. Dr. Treanor filled or partially responded to 6 of them. He did not explain the length or nature of his relationship with Mr. Carlton or Mr. Carlton's prognosis. The section of the form that would have been of most use to the ALJ has 12 subsections regarding details of the patient's functional limitations in a competitive work setting, including how many blocks he could walk, how long he could sit or stand, whether additional breaks would be needed, and his lifting abilities. Dr. Treanor did not respond to any of these subsections. The only one he responded to was "How often can your patient perform the following activities: Twist, Stoop (bend), crouch/squat, climb ladders, climb stairs." There was a check box next to each activity and a scale of Never to

---

[3] The regulations provide that "[g]enerally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527

Frequently. Dr. Treanor simply circled "Never" at the top. Dr. Treanor's opinion offered almost no information to the ALJ regarding Mr. Carlton's actual functional abilities in his opinion.

Mr. Carlton highlights the ALJ's statement that he discounted Dr. Treanor's opinion because Dr. Treanor described the diagnosis as "back pain" when back pain is not a diagnosis but instead a symptom. He says this is an improper basis to discount a medical opinion. But this argument mischaracterizes the ALJ's reasoning. First, it is clear that the ALJ's decision to discount Dr. Treanor was also based on the fact that Dr. Treanor "did not assess how the back pain effects the claimant's ability to work a job, if even at all." Without such an assessment, Dr. Treanor's opinion does not provide the kind of "detailed longitudinal picture" of Mr. Carlton's impairments that is contemplated by the regulations. Further, in noting that Dr. Treanor listed "back pain" as the diagnosis, the ALJ observes that Dr. Treanor provided no basis for the back pain. Moreover, the ALJ seems to be pointing out the cursory manner in which Dr. Treanor filled out the form. Instead of listing an actual diagnosis and putting "back pain" in the symptom section, Dr. Treanor simply filled in "back pain" as the diagnosis and nothing in the symptom section. The lack of detail and attention in this section carries throughout the entire form and is why the opinion offers so little information to assist the ALJ in making his decision. The foregoing reasons provide substantial evidence to support a finding of good cause to discount Dr. Treanor's opinion.[4] Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994) ("[W]hen good cause is shown, less weight, little weight, or even no weight may be given to the physician's testimony.").

---

[4] Moreover, the medical records indicate that Mr. Carlton treated with Dr. Treanor only three times—including one visit for glucose monitoring. R. at 409-26. The visits all occurred in February and March 2016. At the two visits where an examination was performed, Dr. Treanor found Mr. Carlton had full range of motion and normal motor strength in his upper and lower extremities. Mr. Carlton denied painful joints and weakness at both visits. Although the diagnoses included "neuropathic pain," no treatment plan related to such pain was included. In addition to the reasons provided by the ALJ for discounting Dr. Treanor's opinion, it appears that the opinion is inconsistent with Dr. Treanor's own treatment notes. Moreover, it appears Mr. Carlton was only examined by Dr. Treanor twice over a relatively short period and that Dr. Treanor does not specialize in back or neck issues.

Mr. Carlton seems to argue that the ALJ made a reversible error by failing to employ the analysis required by Newton v. Apfel before discounting opinions. In that case, the Fifth Circuit required that "absent reliable medical opinion from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2). Newton v. Apfel, 209 F.3d 448, 453 (5th Cir. 2000). Those factors are as follows:

> (1) the physician's length of treatment of the claimant,
> (2) the physician's frequency of examination,
> (3) the nature and extent of the treatment relationship,
> (4) the support of the physician's opinion afforded by the medical evidence of record,
> (5) the consistency of the opinion with the record as a whole; and
> (6) the specialization of the treating physician.

Id. at 456. The Fifth Circuit has clarified, though, that this analysis is not required where there *is* "reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist." Qualls v. Astrue, 339 F. App'x 461, 466 (5th Cir. 2009). The rule also does not apply where the ALJ has more than one medical opinion before him or her. Id. at 466-67. Here, there is contradictory evidence in the form of the opinion of Dr. Richard who performed a consultative examination of Mr. Carlton and prepared a far more detailed report. Thus, the ALJ's failure to go through the six step analysis is not fatal. Moreover, the ALJ's decision to discount the opinion of Dr. Treanor is consistent with the Newton factors. See footnote 4, supra.

## **RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 10) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 12) be GRANTED.

**OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 2nd day of January, 2018.


Janis van Meerveld
United States Magistrate Judge